Good morning. My name is Kevin Lynch and I am pleased to be here today on behalf of the Audubon Society of Greater Denver, which has many members who regularly use Chatfield State Park, specifically the unique areas that will be lost if this project moves forward. As you can see, many of those members are here today. There's a lot of public interest in this case. This court should not sanction the Corps' attempt to create a double standard for itself under the Clean Water Act. A stringent standard that it applies to everyone else and a lenient standard that it applies to itself so that it can approve projects that would result in avoidable environmental harm. The Corps' narrow and novel interpretation of the Section 404B1 guidelines in this case should be rejected for three main reasons. First, the Corps has violated the Clean Water Act, its own regulations, and all available guidance documents in approving a project even though there were alternatives that could have avoided the environmental harm altogether and also by breaking up the project even though it was one integral part. Do we have to look at the purpose of the project? And I will use in my questioning two key words here. Project is the big project. Exactly, Your Honor. The project in this case... And the plans are the little projects. Yes. Sorry. The plans are what follow. That is, I think one is a recreation plan. Yes, Your Honor. And I forget the name of the other. Yes. So when you say a project, you're talking about the whole idea of increasing water supply. Exactly. And in this case, the Chapwood Reallocation Project, the purpose and need that was identified for this case was to increase the availability of water by 8,539 acre feet. And there were many alternatives that were identified under NEPA that could meet that goal. Yet when it came time to conduct the Clean Water Act analysis, suddenly the Corps reversed its position. No longer were these mitigation components necessary in order for the reallocation to proceed. Instead, it said that they were merely incidental to that project. And that throughout the record in the environmental impact statement. The final main point I would like to make is that the record here in this case shows that there were other, that the preferred alternative, alternative three in this case, was the most environmentally damaging alternative. And even though the Clean Water Act requires the Corps to choose the least environmentally damaging alternative. And that suggests why the Corps adopted this novel and narrow interpretation of its own guidelines, because it knew that it would have a difficulty approving the preferred alternative in this case if it didn't come up with a contrary alternative interpretation here that contradicts all of the guidelines, the guidance documents. And the third alternative is under which analysis? The analysis for the project or for the plans? For the project, yes. There were four alternatives to the Chapwood Reallocation Project that were considered alternative three. Other alternatives that they that they denied, rejected, whatever. Would they have satisfied the water needs that were the driving force behind this project? Yes, Your Honor. The Corps found that all four of the alternatives would meet the purpose and need that was identified for this project. And that's why they didn't want to consider those under the Clean Water Act. NEPA, as I'm sure you're aware, is a procedural statute. It requires the Corps to evaluate environmental alternatives, but it doesn't specify which alternative must be chosen. But the Clean Water Act has a substantive mechanism. It forces the Corps to only approve projects that, I'm sorry, forbids them from approving projects if there are alternatives that could avoid the environmental harm altogether. And that's why- One of the alternatives was this non-tributary groundwater basin, apparently, correct? Yes, Your Honor. That was one component combined with gravel pits. Did that include a potential recharge of that non-tributary basin by using direct flows into that non-tributary basin? I don't believe so, Your Honor. That was one of the issues was they were trying to find more sustainable water supplies and not rely on those non-tributary groundwater. Well, that would be very non-sustainable, right? Because by the time they deplete the Yes, Your Honor. And my clients have suggested numerous alternatives that were not given detailed consideration in this case, specifically water conservation and also storage and another existing reservoir. But did you challenge the non-selection of that alternative? Yes, Your Honor. That's one of our three main claims. You're basically supporting a non-sustainable alternative? We are not supporting alternative two, Your Honor, which was the non-tributary groundwater. What my clients have advanced in this case is that the Corps should have looked at three other main alternatives, specifically increasing water conservation beyond the baseline that has already been implemented, storage at Ruderhest Reservoir. Let me just see how the district court dealt with this. The district court said that's a non-starter because what is necessary is an increased supply and that doesn't increase the supply. That's the way the district court dealt with it. That's correct, Your Honor. That is what the district court said. That finding was in error, however, because the purpose and need of the project was not to increase storage capacity. It was to increase the availability of water by 8,539 acre feet. The EPA in this case submitted comments to the Corps Civil Works Program and so did the Corps Regulatory Program that said that water conservation appeared to be able to meet the purpose and need for this project. And so that is an explanation for why they didn't want to consider it because it would have looked much better than the alternatives that they did look at. Would that have been something that could have been a reliable source of water? Yes, Your Honor. We hope people do better, but maybe next week they won't. Well, the great thing about water conservation is it relies on existing water supplies and simply stretches them further. In contrast, the storage of water at Chatfield Reservoir was actually found by the Corps in this case to result in zero dependable yield. That is a primary mechanism that's used for these water supply projects. Sometimes it's firm yield, sometimes it's safe yield. In this case, they said dependable yield. They did six different calculations. This is in Appendix BB of the Environmental Impact Statement. Under all of those calculations, this project resulted in a zero dependable yield. And thus it shows that relying on storage of very junior water rights is not a great way to prevent droughts. Are you talking about the project itself? Yes, Your Honor. If completed, it has zero dependable yield? Yes, Your Honor. So what's the point? I agree. It's surprising to me as well that they wanted to approve this plan. And on top of that, they're having to spend $127 million to mitigate all of the environmental harm that is caused by this project. We've spoken to counsel. I took from your introduction that you were concentrating on the Clean Water Act issue. And I'd like to come back to that. And this is really to clarify, I think, your argument. Under your view, is it that the Clean Water Act analysis should have considered alternatives 1, 2, 3, and 4 in the CWA analysis? And they didn't do that. Yes, Your Honor. Then how does the Clean Water Act analysis then become different from the NEPA analysis? It sounds like they're going to be both the same. It's not necessarily different, Your Honor, in terms of the scope. And the regulations in this case, 230.10A4, suggests that in most cases the consideration of alternatives under NEPA will provide the necessary analysis for the Clean Water Act. What's different is that the Clean Water Act actually has a substantive forcing mechanism. It says that the Corps cannot approve a project if there are practicable alternatives that are less environmentally damaging. How does the regulations for the Clean Water Act, 230.10, 230.82, the practical alternative, the alternative is practical, how do those regulations unambiguously require the Corps to consider the NEPA alternatives in performing their Clean Water Act analysis? There's two main reasons, Your Honor. So first is that Section 230.10A2 says that practicable alternatives must be considered in light of the overall project purposes. So this gets to the point that Judge Briscoe was making earlier. They must look at the overall purpose, not just the narrow portion, the mitigation that is required. Well, how do we know in the context of the language overall project purposes, which is not in the NEPA, it's in the Clean Water Act, how do we know unambiguously that project refers to the whole reallocation project or to the mitigation project? Wouldn't it be reasonable to read it either way? There's a few main points here, Your Honor. First, the argument that the Corps has advanced would read out another portion of the regulation. This is in 230.10A1I, where it says that practicable alternatives must include alternatives which avoid the discharge. And there's a particular sequencing that is built in there. The very first point is avoidance. The other points the agency must consider after avoidance is then minimization of harm, and only after avoidance and minimization does it look to mitigation of harm. Counsel, we'll have to parse through that, obviously. Yes, Your Honor. But I'm still back on overall project purposes, and we're not talking about the NEPA statute now. Right. So the dredge and fill has to do with these mitigation projects. Why doesn't that reasonably refer to those projects? Two main points, Your Honor. First, the planning and guidance notebook, it's a guidance document that the Corps Civil Works Program developed. It also specifies at page 2-5 that the Corps must always be looking at the larger complete plan in this point. And if you apply that to our case, that means not the mitigation but the broader reallocation project. The last point I would just make on that issue, Your Honor, is that there's no suggestion that the recreational modifications would ever go forward if the reallocation wasn't happening. There's no suggestion that the environmental mitigation would be happening unless the reallocation were happening. I don't think that is disputed, and I don't think there's any way that that could reasonably dispute it. And the reason to get to what the overall project purpose is, the Corps has developed a concept called independent utility. This is discussed in several of the key cases that have been cited here. In the Whistler case out of the Eighth Circuit, the court said it was appropriate for the Corps to narrow its analysis because the project at issue had independent utility. In the Florida Wildlife Federation case, this is out of the Southern District of Florida, the Corps had asserted that a narrow portion had independent utility, but the court said that that was an arbitrary and capricious finding. If you apply that concept to our case, the recreational facilities have no independent, recreational modification has no independent utility. They wouldn't be moving the recreational facilities if they weren't planning to flood them. Same thing for the environmental mitigation. It has no independent utility. They wouldn't be doing the environmental mitigation if they weren't planning to destroy a lot of critical wildlife habitat in this case. It sounds though, counsel, like what you're arguing is that the alternative analysis for Clean Water Act purposes is to look at the alternatives to alternative three. Is that correct? Yes, Your Honor. Is that all that is required? Yes, I believe so. And this is not just me that is arguing. How can that be when in your NEPA argument you're saying that the Corps didn't look at at least three other alternatives? I'm sorry, Your Honor. Perhaps I misunderstood your question. Our position is that they should look at the alternatives that were considered under NEPA as well as the other reasonable alternatives that were improperly excluded under NEPA. My question is that it seems like you're conflating the two statutes in what the Corps is supposed to do. Yes, Your Honor. And that's certainly the position. Your argument is that they're segmenting. I'm sorry. I didn't hear your question. Your argument is that they're segmenting. Yes. So we have analogized to the anti-segmentation rule under NEPA. The other side has suggested we are improperly conflating those analyses. But it is not us that have taken that position. The Corps itself took that position in its regulations when it said ordinarily the NEPA analysis will provide the information necessary for the Clean Water Act analysis. The Corps Regulatory Program and EPA have also given further interpretation of what these guidelines mean. In particular, the Memorandum of Agreement lays out that sequencing that I was discussing before in terms of avoidance, minimization, and then mitigation. The Memorandum of Agreement also lays out that the entire project should be considered. There's numerous references throughout the record of the Corps Regulatory Program and EPA stating that the overall project needed to be considered, which was the reallocation. And we are simply advancing that same position. I would just end, Your Honor. I'm not aware of any case where an agency has adopted two simultaneous interpretations of a regulation that directly conflict with each other. The other side has not pointed to any, and you should not sanction such an approach in this case. I'd like to reserve my remaining time for rebuttal. Good morning. May it please the Court. Good morning. I'm Summer Ingalls here for the United States, and we request that the Court affirm the District Court's judgment in favor of the Army Corps. I'd like to begin my remarks today by drawing a clear line between the Corps' NEPA analysis and its Clean Water Act analysis, which should be kept distinct, and which the Court properly distinguished between when it completed its analysis of the larger project here. If I may, please. Sure. In response to one of Judge Briscoe's questions, the answer was that there would be no basic increase in supply or yield. Is that correct? I'm not sure that that's true. What do you mean you're not sure? We can't build, you can't affect or disturb a project, existing project like Chatfield, without being sure. I understand your point. The point is that the reallocation would permit the additional storage of this water. Are there water rights out there that are being dedicated to storage use, to storage in Chatfield, increase the supply? I believe so, Your Honor. The point here is that the self- Now we're at the belief stage.  Maybe I didn't understand the question. Well, is there going to be an increase of supply to Chatfield under the plan? Yes, there will. But the increase in supply is contingent on the South Platte River reaching a level that will enable the water to come into Chatfield. And that's how this statement of zero likelihood of increase is in the record, because it was contingent upon flowing into the reservoir? I'm not familiar with that statement in the record. Well, we can check it. I'm sorry, I will check it. The point is that the NEPA analysis considered this additional discharge at the maximum level to evaluate and disclose the maximum effects that would occur if this maximum level of water is permitted. I think whether that additional water will actually come into the reservoir will depend on a variety of environmental factors, which- Like rain. Like rain, exactly, which is why this project is important. The water availability in this region is limited, and the Corps evaluated these- Well, that's why I'm asking the questions about decreed rights that you propose to store in the reservoir. I'd like to have some comfort that there are, in fact, decreed rights that aren't going to impact senior water users, or whether you're just kind of betting on the come on the flooding of the Platte to maybe catch excess flows. Matt, I understand. Perhaps it would be best if I submit a 28-J letter addressing that particular issue. I'm not prepared to discuss the amount of additional water that will come in on a factual level at this time. I can submit that letter. But my larger point here is that the Corps completed a NEPA analysis, and it completed a Clean Water Act analysis. And the NEPA analysis evaluated alternatives to the reallocation project. But the argument is that you segmented the analysis, right? That's right. But to the extent that any segment- And what the district court said, and I kind of went to the district court record on the anti-segmentation under the Clean Water Act, and it said essentially that it was a non-starter argument because of the fact that the, as I understood the court, that there was no, let me find the language here. It says the bulk of the discharge requires Section 404 analysis results from the reallocation or the relocation of the recreational facilities. So it said essentially you're just jumbling the argument, it seemed to me, on the anti-segmentation rule. That's correct. To be clear, we didn't advance the anti-segmentation argument. I think, as I understand it, my opposing counsel asserts that a NEPA regulation addressing anti-segmentation should apply in this context. But it shouldn't. The point of that regulation is to ensure that an agency doesn't break apart a project in order to reach a finding of no significance. Isn't that a good argument in this case? It's been broken apart. You have the project, and then you have the two plans. Why not look at the whole thing together and say if you do this, this will be the effect, and that will bring in both NEPA and the Clean Water Act at the same time? The point is that in the course of its NEPA analysis, which considered the entire reallocation and alternatives to that reallocation, the Corps also considered the impacts that would come from mitigation, and that's in the record. So there was no segmenting, in your view, because you're saying they looked at everything. They even looked at the dredging, the effect of dredging. That's correct. Not at the NEPA level when they were looking at project alternatives. Yes, and that's in the record at pages 830 to 842 of the appellant's appendix. That's in the NEPA context. So both mitigation projects were part of the NEPA analysis. Is that what you're saying? That's correct. All right. But if the mitigation projects were integral to alternative three, then why is it that when they got to the Clean Water Act analysis that the alternatives were constrained to alternatives to the mitigation projects as opposed to alternatives to the reallocation project as a whole, given that the mitigation projects were integral? Yes. The point is that when the Corps completed its NEPA analysis, it was considering the reallocation and mitigation impacts, but the reallocation itself does not require dredge and fill materials. Well, why not? If the mitigation projects are part and parcel, integral to, the dredge and fill is incorporated really by reference, isn't it? This is where it's important, I think, to keep the two statutes distinct. The Corps completed a broad NEPA analysis, but its Section 404 analysis addressed, consistent with the statute and the regulations, only dredge and fill materials. The Corps has limited jurisdiction under Section 404 to evaluate discharges of dredge and fill materials. And although the Corps did consider in the course of its NEPA analysis both the reallocation and the dredge and fill that would come from mitigation, its Section 404 analysis was not necessarily distinct. And the regulations specify there that the Corps should consider alternatives to the proposed discharge, which would occur both under the Recreation Mitigation Plan and the Compensatory Mitigation Plan. The regulations also state at 230A4 that although the alternatives considered in a NEPA analysis might be the same as the alternatives considered in the Clean Water Act analysis, those alternatives might be different. And this was a proper case to consider different alternatives. Or is it a proper case, again, if the mitigation projects are interwoven with Alternative 3? I think perhaps the way to think about this is when the Corps considers discharges proposed in the course of completing a pipeline, for example. There the Corps would consider in its Section 404 analysis only discharges that would occur for dredge and fill materials in jurisdictional waters. It wouldn't consider the entire project or suggest, for example, that discharges could be avoided by completing a solar field. So when the Corps completes the Section 404 analysis, it's necessarily much more discrete than an analysis of the broader project. Well, are you saying necessarily or is this one way of looking at it? It's not necessary. Of course, my point is that in this context it was proper. As I've mentioned, the reallocation raises water levels and discharges were only contemplated in the two mitigation plans. How much does your argument rely on interpreting the words overall project purposes in the regulation? As we read the regulation, the phrase overall project purpose should be read in the context of Section 404 and the regulations. I think that overall project purpose links to proposed discharge. And so the Corps necessarily considered the overall project purposes in the context of, as I've mentioned, the compensatory mitigation plan and the recreation mitigation plans. So it considered the project purposes there. And the other point is that when it considered this dredge and fill analysis, it didn't say we're going to consider these discharges and these plans. It said we're going to consider the broader purpose of these two mitigation plans. And the Corps also considered alternatives that didn't require dredge and fill, but ultimately determined that implementing the mitigation plans without dredge and fill would result in broader environmental impacts. And therefore, under Section A, where it says so long as the alternative does not have other significant environmental consequences, determined that completing the project without dredge and fill would not be permissible under the regulation. Thank you. With respect to the content of the Corps' NEPA analysis, although I'm happy to come back to the Clean Water Act, the content was also reasonable. The Corps evaluated 38 different project concepts. And in that analysis, it considered increased water conservation, use of upstream gravel pits, and use of the Ruderhesse Reservoir. And with respect to increased water conservation, it determined that such conservation at current levels and also at levels that could be implemented in the future would simply not meet the project's goal of providing additional water for the Denver area. And therefore, it eliminated that. Haven't there already been substantial conservation efforts in the Denver metro area? Yes, there have. And the appendix AA in the record describes both current mitigation measures or water conservation measures and also measures that can be taken in the future. But the Corps determined that those measures were an important parallel action and not one that would meet the project's purpose and need as a standalone alternative. And so those alternatives were carried forward to be implemented by the water providers but were not analyzed as standalone alternatives. And the Corps provided a brief explanation for its decision not to evaluate those alternatives in further detail. The other point I think is important to mention here is that when it selected the Chatfield alternative, it determined that the environmental impacts that would come from that alternative would be mitigated in the compensatory mitigation plan. And so although Audubon asserts that that project was the most environmentally damaging, when the Corps completed its Section 404 analysis, it explained that the mitigation measures would mitigate the effects of dredge and fill. And in its NEPA analysis, it explained that the alternative is the least environmentally damaging alternative. And that's explained at page 819 in the record. And the Corps' determination that impacts would be mitigated is at page 638. I had a question about, is it the Reeder-Hess, is that the correct pronunciation? The Reeder-Hess Reservoir. Why wasn't expansion of the reservoir a viable alternative? As I understand it, expansion completed in 2012, which was when the Corps was completing its analysis. But the information available to the Corps at that time indicated that use of that reservoir would be taken up by other water providers and that no further capacity would be available for sale. And there was no, I just want to make sure I'm understanding this, no potential for additional expansion? That's my understanding. So the Corps explained in the NEPA that use of Reeder-Hess Reservoir and water capacity there would be important for the Denver area, but that additional water would be necessary for storage in Chatfield Reservoir. Make sure I meet all my points here. If the Corps has no further questions, I'm happy to discuss the supplementation issue. Otherwise, I would rest on my briefs. Well, I have a question regarding the fluctuation of the water level in the reservoir. There currently is some fluctuation, I take it. Yes, that's correct. In water levels. And the plan takes into consideration the fact that there will be increased fluctuations in the reservoir. Why will that fluctuation occur? Is it merely because of the flooding phenomenon where you can store only flood water? I think the fluctuations will occur because water levels in the South Platte River will change and also the reservoir is operated in a way that takes a variety of interests into account, but I can't provide any further information at this time. I'd be happy to add that to my letter. Meaning inflow and outflow will vary. Yes, correct. If the Court has no further questions, we request that the Court affirm the District Court's judgment in favor of the Army Corps. Thank you very much. Thank you, Your Honor. Just a few brief points in rebuttal. The first thing I would like to point out, the Corps' Clean Water Act Analysis was conducted in Appendix W of the Environmental Impact Statement. If you look to that, you will see they didn't do a 404 analysis on the Recreational Facilities Modification Plan. They did an analysis for the Chatfield Reservoir Storage Reallocation. When they describe the project, they're not describing the recreational modification. They're describing the reallocation. If you turn to the first page, W5, where it first suggests that the recreation is incidental to the proposed reallocation, further up on that same page it says that the environmental mitigation and recreational modification are required because of the reallocation. So I think there can be no question that the project is integral in this case and the appropriate scope is the full, complete project. The second point I would like to just address, we heard a new argument from counsel that we had actually expected in the District Court. It was never advanced, and that is that mitigation means that Alternative 3 is the least environmentally damaging alternative. That argument is clearly foreclosed by the Corps' guidelines and the regulations which say, or the guidance documents which say you cannot consider compensatory mitigation until after you've determined what the LEDPA is. Otherwise, you would always find that any alternative would be the least environmentally damaging because you could just mitigate whatever the harms were. Briefly, I would just address, Your Honor, you were asking about the Ruderhest Reservoir. And I see my time is out. Would you like me to continue? Sure. The Ruderhest Reservoir, the Corps suggested that there was no additional storage capacity there. We're not arguing that they should expand it, but there was an indication in the record from comments by my own clients that that reservoir could hold an additional 42,000 acre-feet, which is double the capacity of the expansion at Chatfield. And the only suggestion from the Corps is that they assert that Parker Water Sanitation District would not make that available to other users. They have no evidence for that. It's just their own conclusive reassertion. Thank you. Thank you. Thank you both for your arguments this morning.